329 P.2d 398

**UNION PACIFIC RAILROAD COMPANY,**
**Plaintiff and Appellant,**

**v.**

**TRUSTEES, INC., and Jean C. Cranmer, Thomas D. Braden and Edward G. Knowles, Defendants and Respondents.**

No. 8762.

Supreme Court of Utah.

Aug. 13, 1958.

102

F. E. Barnett, New York City, W. R. Rouse, Omaha, Neb., Covington Hardee, New York City, Bryon P. Leverich, M. J. Bronson, Salt Lake City, for appellant.

Senior & Senior, Kline D. Strong, Salt Lake City, for respondents.

HENRIOD, Justice.

Appeal from a judgment 1) declaring ultra vires a resolution of plaintiff's directors, authorizing a $5,000 contribution of corporate funds to the Union Pacific Railroad Foundation, a non-profit corporation organized by plaintiff, dedicated to charitable, scientific, religious or educational purposes, and declaring 2) that the plaintiff was powerless statutorily or charter-wise to make contributions for the public welfare or for charitable, scientific, religious or educational purposes. Reversed. No costs awarded.

Plaintiff urges that 1) the contribution was a proper exercise of corporate power under a May 10, 1955 statute,[1] since a) the legislation permitted a pre-existing corporation like plaintiff to exercise the power b) which would not represent any change in the shareholders' contract objectionable on state or federal constitutional i) impairment of contracts [2] or ii) due process [3] principles; and that 2) the contribution was valid as having been made under a corporate implied power.

We feel constrained to hold that plaintiff was empowered impliedly to contribute the sum mentioned. It is unnecessary, therefore, to entertain other contentions urged. In concluding as we do we are not unmindful of the principles urged by counsel for the parties to the effect that a strict interpretation is to be given to expressed corporate powers,[4] except as implemented by "implied powers * * * incidental to and connected with the carrying into effect or the accomplishing of the general purposes of the corporation, as expressed in the object clauses of its articles," [5] or except as are "necessary, usual, or incidental to its business;" [6] that "every stockholder has a vested equity in and to the assets of the corporation;" [7] and that charitable gifts by non-charitable corporations generally are ultra vires,[8] unless beneficial to the corporation.[9]

1. Chap. 22, Laws of Utah 1955 (Title 16-2-14, Utah Code Annotated 1953, as amended): "The corporation in its name shall have power * * * (8) to make donations for the public welfare or for charitable, scientific, religious or educational purposes. * * *"

2. Utah Const. Art. I, Sec. 18; U.S.Const. Art. I, Sec. 10, cl. 1

3. Amend. XIV, Sec. 1, U.S.Const.; Utah Const. Art. I, Sec. 7.

4. Zion's Sav. Bank & Trust Co. v. Tropic & East Fork Irr. Co., 1942, 102 Utah 101, 126 P.2d 1053; Art. XII, Sec. 10, Utah Constitution: "No corporation shall engage in any business other than that expressly authorized in its charter, or articles of incorporation."

5. Tracy Loan & Trust Co. v. Merchants' Bank, 1917, 50 Utah 196, 167 P. 353, 355.

6. Hadlock v. Callister, 1935, 85 Utah 510, 39 P.2d 1082, 1085.

7. Garey v. St. Joe Mining Co., 1907, 32 Utah 497, 91 P. 369, 377, 12 L.R.A.,N.S., 554.

8. Fletcher Cyc. of Corp., Perm.Ed. Sec. 2939, p. 667.

9. Hutton v. West Cork Ry., 23 Ch.D. 654 (1883).

■ One case has sustained a contribution of corporate funds to Princeton University, where the corporation had existed prior to passage of a statute authorizing such contributions.[10] It was sanctioned on both implied power and statutory grounds. We subscribe to the former. As to any statutory question, Utah's policy demands the inclusion of an express authorization to justify any retrospective application of a statute.[11] That policy was approved in previous pronouncements,[12] so we need not discuss problems sired by the Dartmouth College Case (Trustees of Dartmouth College v. Woodward)[13] relating to an "immutable contract"[14] and "reserved powers."[15]

■ Plaintiff was incorporated in 1897 to operate a railroad, at a time when there were comparatively few corporations. There was not the concentration of wealth that exists in the corporate world of today. Plaintiff's charter gave no express power of contribution, there was no legislation authorizing it, and none existed until and unless it was provided by the 1955 legislation.[16]

Four Denver, Colorado shareholders,—three of them on September 26 and one on September 27, 1955, dispatched identical communications addressed to plaintiff in New York, challenging the contribution and suggesting litigation to test it. Plaintiff saved them the trouble, filing a declaratory judgment suit against them in Salt Lake City on September 28, 1955, in what appears to have been one of the speediest, most understanding corporate responses to benevolent shareholder belligerency on record.

Although not determinative, it may be pointed out, at least parenthetically and to illustrate a type of corporate power that we would consider implied, that within the first decade of its existence, on the occasion of the San Francisco earthquake,[17] the Union Pacific, without charge, shipped in 1,600 carloads of food and material and gave $200,000 cash to, and evacuated a quarter of a million persons from the stricken area gratis. No immediate benefit was apparent, but it cannot be gainsaid, it would seem, that the future interests of the company de-

10. A. P. Smith Mfg. Co. v. Barlow, 1953, 26 N.J.Super. 106, 97 A.2d 186, affirmed 1953, 13 N.J. 145, 98 A.2d 581, 39 A.L.R. 2d 1179.

11. Since 1898, in a number of compilations and revisions, lastly in Title 68–3–3, U.C.A.1953, it has been enacted that "No part of these revised statutes is retroactive, unless expressly so declared."

12. Petersen v. State Tax Commission, 1944, 106 Utah 337. 148 P.2d 340; Mc-

Carrey v. Utah State Teachers' Retirement Board, 1947, 111 Utah 251, 177 P. 2d 725.

13. 1819, 4 Wheat. 518, 4 L.Ed. 629.

14. Zabriskie v. Hackensack & N. Y. R. Co., 1867, 18 N.J.Eq. 178.

15. Durfee v. Old Colony & F. R. R. Co., 1862, 5 Allen 230, 87 Mass. 230.

16. See footnote #1.

17. 1906.

rived from good will, must have been priceless.

In 1935 Congress encouraged corporate contributions to eleemosynary causes by allowing a deduction for tax purposes in such cases.[18] That encouragement persists.[19] From 1940 such corporate contributions rose from $40,000,000 to half a billion dollars in 1955. Since World War II, operating costs have soared. Increasing tax burdens pretty much have relegated large personal fortunes to an almost forgotten era. Many endowment rivers that yesteryear coursed into private education, charitable and religious institutions have become but trickles, portending a thinning of the ranks of top business executives, most of whom were recruited from private institutions. Such dessication initiated new calls upon industry and hence upon the business corporation as a means of securing funds to perpetuate these private institutions. The dissent correctly points out that there are more donors today but fails to state that operational costs have spiraled far beyond the same percentage of dollar volume of giving that obtained in previous years.

The federal policy reflected in tax deductions finds·its counterpart on the local level by passage of legislation in 80% or more of our states and territories. Most of this legislation was passed in the past decade.[20] The American Bar Association Committee on Businss Corporations also has encouraged, by resolution, legislation empowering corporate donations to charitable, scientific, religious and educational institutions. The new concept of corporate responsibility seems to have become fait accompli.

Directors of the plaintiff testified with singular unanimity that such new concept conceived in a shifting socio-economic atmosphere was born of new corporate business policy. It seems to be nurtured by legislative, corporate and judicial thinking. A reasonable percentage of corporate income, they urge, should be earmarked for worthy causes, as a necessary and proper item of business expense, just as funds are tagged for advertising, public relations and the like.

Mr. E. Roland Harriman, Chairman of plaintiff's Board,[21] said "I think it is good

18. Aug. 30, 1935, Chap. 829, Sec. 102(c), Vol. 49, Part I, Public Laws U.S. 1016.

19. Sec. 170, Internal Revenue Code 1954, 26 U.S.C.A. § 170.

20. Ark. (1951), Cal. (1949), Colo. (1947), Conn. (1953), Del. (1941), Dist. of Col. (1951), Fla. (1955), Ga. (1953), Hawaii (1947), Ill. (1919), Ind. (1949), Kan. (1951), Ky. (1952), La. (1954), Me. (1951), Md. (1945), Mass. (1953), Mich. (1953), Minn. (1949), Miss. (1952), Mo. (1937), Neb. (1953), Nev. (1953), N.H. (1953), N.J. (1931), N.M. (1951), N.Y. (1941), N.C. (1945), Ohio (1953), Okl. (1949), Ore. (1953), Penn. (1945), R.I. (1952), Tenn. (1925), Tex. (1935), Utah (1955), Vt. (1953), Va. (1954), Wash. (1953), W.Va. (1949), Wis. (1951).

21. Also, Chairman, American National Red Cross, Trustee, American Museum of Natural History, and holder of other kudos.

business to do so; in the long run beneficial to our stockholders * * * I think the public has come to expect that we will support worthwhile local and national causes, and, in effect, we agree with this viewpoint." Mr. John S. Sinclair, director,[22] said: "We have come to expect corporations to behave in the field of social consciousness' as individuals would behave,— that is, with a prudent eye to its financial capacity and selectivity as to the objects of its generosity * * * Corporate donations create good will in the community." Mr. William C. Mullendore, director,[23] said "The basis of our policy of making contributions in aid of * * * educational and charitable institutions is, first of all, as a citizen of the community dependent upon the good will of the customers * * *. We have included in our regular operating expenses the provision for those donations, as necessarily included in a much larger * * budget for maintenance of our physical equipment."

There seems to be no good reason to challenge the convictions of these men, the bona fides of their support for the contribution in question or their belief that it was for the best interests of the company and its shareholders. If their personal judgment was unsound, it is not reflected in this record, in the expressed national and state legislative encouragement of such practice, in the expressed opinions and thinking of members of legal groups concerned with the matter, nor by the mushrooming statistics dating from 1940 that clearly reflect an ever-increasing belief on the part of those who manage and run institutions flying a corporate ensign that it is sound business to contribute to agencies fostering charity, church, science and school.

It strikes us as being rather inconceivable, in what seems to be a visible, substantial national trend, that men heretofore known for their administrative and executive experience and ability, suddenly and deliberately would espouse a program on behalf of a corporation in which they are interested, and to whose shareholders they are amenable and accountable, if they were not confident that their company presently and directly, or within the foreseeable future, would receive a quid pro quo as the resultant of good will engendered by contributions. It strikes us also that to condemn the contribution in this case, as constituting a dissipation of corporate assets, is to indulge not only an ipse dixit, but a basic non sequitur, since it has not been demonstrated that the contribution has been wasted or that no benefit will accrue therefrom.

The iconoclast may discount the suggestion that corporations have been endowed

---

22. Also, President of the National Industrial Conference Board.

23. Also, Chairman of the Board, Southern California Edison Co., Director, North American Aviation, Trustee, Mutual Life Ins. Co., and Trustee, University of California.

with a new kind of altruistic conscience, as being mythical and hardly a reason to support corporate action based on implied power, but aside from any desire to assist others without hope of reward, when a contribution to a laudable cause has been made, a real, important and serious question is posed: Why was the contribution made? We believe that if it were made with the studied and not unreasonable conviction that it would benefit the corporation, it should be the type of thing that should rest in the sound discretion of management and within the ambit of a legitimate exercise of implied authority in the ordinary course of the company's business. It is not too much unlike the sponsoring of a baseball team, subsidizing promising scholars with a view toward possibly employing them later on, giving to the local community chest, paying the salary of a public relations expert, sponsoring a concert or television program, or conducting a newspaper or radio advertising program. Such actions seldom produce any immediate and direct corporate benefits, but all involve use of corporate funds that otherwise could have gone to shareholders had such funds remained unspent. Few would venture that the company could not do all these things without express, specific authority in the charter. We think that a power once denied today may be implied under changed conditions and philosophies, and that in the light of present day industrial and business exigencies, common sense dictates that included in the implied powers of a corporation, an authority should be numbered that allows contributions of reasonable amounts to selected charitable, scientific, religious or educational institutions, if they appear reasonably designed to assure a present or foreseeable future benefit to the corporation; that management's decisions in such matters should not be rendered impotent unless arbitrary and unreasonably indefensible, or unless countermanded or eliminated by action of the shareholders at a proper meeting

The contribution in the instant case appears to fall within implied corporate powers under such principles.

McDONOUGH, C. J., and WADE, J., concur.

CROCKETT, J., does not participate herein.

WORTHEN, Justice (dissenting).

I dissent.

I am in agreement with Mr. Justice HENRIOD that the contribution of corporate funds to the Union Pacific Railroad Foundation cannot be sustained under the 1955 amendment to Sec. 16-2-14, U.C.A.1953 since to so hold would give retrospective effect to the same. I am likewise in accord with him that without the said amendment there is not in the statutes of this state any authority specifically authorizing such dona-

tion. I also am in concurrence with Justice HENRIOD that there is no express power in appellant's Articles of Association dated July 1, 1897, nor is there any such express power contained in any of the amendments to appellant's articles.

It is strange indeed that the majority opinion finds the exercise of the power here justified as incidental to or connected with the carrying into effect or the accomplishing of the general purposes of the corporation as expressed in the object clauses of its articles. Such power certainly is not necessary, usual or incidental to its business.

The Utah Constitution, Article XII, Section 10 provides:

"No corporation shall engage in any business other than that expressly authorized in its charter, or articles of incorporation."

The objects and purposes of the appellant as authorized in the Articles of Association spelled out the powers of a corporation for pecuniary profit, and not of one without profit motive.

The articles also contained the following:

"It may also from time to time amend these Articles of Association by filing amended Articles of Association, increasing the capital stock, or otherwise, agreeably with law, enlarging or changing the powers of the corporation hereby formed."

It should be observed that on eight occasions between 1899 and May, 1953, amendments were made to the articles but in none was the corporation given power to make contributions to the public welfare, or for charitable, scientific, religious or educational purposes.

The question then for our determination is this—May the directors without authority having first been given by the stockholders make such contributions.

The directors have such power if it has been expressly granted. All concede that no specific grant of such power is anywhere present in the articles or in any amendment. If, then, such power is lodged in the directors the same must be found in some implied power reasonably necessary or expedient to the conduct of the business of the corporation. But no such implied power can be carved out for the purpose of doing anything that is inconsistent with the articles or with the Constitution or laws of Utah. How then stands the case?

The entire argument of the majority opinion is devoted to the claimed need of the recipients of the charity and scant attention is given to the question of the legality of the gift. It adopts that questionable philosophy that the end justifies the means. But we are bound by the Constitution, statutes and prior decisions of this court holding that the gift in question is en-

tirely outside the present powers of the corporation.

I cannot say that I am in disagreement with the lofty purposes announced by certain directors of appellant corporation, but what I do say is this: That the worthwhileness of the end and the aim envisioned by the directors is no proper substitute for stockholder authority to act as proposed.

The entire argument of the court's opinion is devoted to the crying need of the recipients of the charity. We are satisfied that great need exists for private contributions in increasing amounts in order that private educational institutions of the country may continue operating in the style to which they have become accustomed or better. Only among the inhabitants of Sherwood Forest has need been accepted as justifying the end. An apparent fallacy of reasoning in the majority opinion is the assumption without citation of authority that "Endowment rivers that yesteryear coursed into private educational, charitable and religious institutions have become but trickles," provoking the conclusion that business corporations must provide the funds to perpetuate these private institutions.

At the trial E. Roland Harriman testified:

"Q. Was there, post-war, in your thinking a degradation in the individual concept of responsibility toward charitable or educational or public welfare contributions? A. A 'degradation' did you say?

"Q. Yes. A. In other words did individuals give less?

"Q. What I am saying, did individuals conceive that they had less responsibility? A. No, sir. I believe the contrary. There are more people giving now than ever before."

The leading case and the only case cited by the majority opinion which sustains the concept of implied power of a corporation to make a charitable donation is A. P. Smith Mfg. Co. v. Barlow.[1] In that case the court held that the common law afforded full warrant for the contribution by the directors to an educational institution. The New Jersey Court in justification of the power claimed, said:

"The genius of our common law has been its capacity for growth and its adaptability to the needs of the times. Generally courts have accomplished the desired result indirectly through the molding of old forms. Occasionally they have done it directly through frank rejection of the old and recognition of the new. *But whichever path the common law has taken it has not*

1. 1953, 26 N.J.Super. 106, 97 A.2d 186, affirmed 1953, 13 N.J. 145, 98 A.2d 581, 586.

*been found wanting as the proper tool* for the advancement of the general good." (Emphasis added.)

Neither path mentioned in said opinion is availible to us. We are charged with giving due consideration to our statutes and not substituting the common law for the same.

Our statute respecting the common law and statutory construction is stated in Section 68–3–2, U.C.A.1953, which provides:

"The rule of the common law that statutes in derogation thereof are to be strictly construed has no application to the statutes of this state. The *statutes establish the laws of this state repecing the subjects to which they relate,* and their provisions and *all proceedings under them are to be liberally construed with a view to effect the objects of the statutes and to promote justice.* Whenever there is any variance between the rules of equity and the rules of common law in reference to the same matter the rules of equity shall prevail." (Emphasis added.)

It is admitted that there was no statutory power for corporations to make charitable gifts in the laws under which appellant was organized, even though those statutes spelled out in considerable detail the power of corporations

The objects and purposes of the Union Pacific authorized in its Articles of Association are:

" * * * to purchase, own, hold, enjoy, maintain, operate and further extend the railroad. * * *"

This court has declared that only those powers necessary to the fulfillment of the express powers granted to the corporation will be implied. I cannot discern wherein the proposed gift is necessary, or even remotely calculated, to the fulfillment of the express (or implied) powers and purposes authorized by the corporate charter. It is stated by Fletcher [2] "A gift of its property by a corporation not created for charitable purposes is in violation of the rights of stockholders and is ultra vires however worthy of encouragement or aid the object of the gift may be."

This court has held that our Constitution requires a strict interpretation of the articles to narrowly restrict the objects and purposes of the corporation to those stated in the articles.[3] In that case the court quoted approvingly from an earlier Utah case and said:

"Implied powers of a bank, or of any corporation for that matter, are those incidental to and connected with the

2. Cyclopedia of Corporations, Perm.Ed. Sec. 2939, page 667.

3. Zion's Sav. Bank & Trust Co. v. Tropic & East Fork Irr. Co., 102 Utah 101, 126 P.2d 1053, 1055.

carrying into effect or the accomplishing of the general purposes of the corporation, as expressed in the object clause of its articles. When it has been determined that the acts done, or attempted to be done, *are not within the powers of the corporation* to do, no implied powers can validate such acts." (Emphasis added.)

The main opinion observes that Congress has encouraged corporate contributions to charitable institutions by allowing a deduction for tax purposes. It is also observed that the American Bar Association Committee on Business Corporations has also encouraged, by resolution, legislation empowering corporate donations to charitable, scientific, religious and educational institutions. But the opinion does not observe or contend that the position of Congress or the American Bar Association suggests that such corporations go forward with a giving program without legal authority or, in the absence of such authority, without authorization from the real parties in interest, the shareholders.

I have searched both the majority opinion and the record in vain, to find the necessary facts or circumstances that constitute the basis for the conclusion that there is present the implied power to make the contribution.

It appears that the author of the majority opinion has become hypnotized by the directors who sought to justify the donation, "men heretofore known for their administrative and executive experience and ability." Mr. Justice HENRIOD observes, "There seems to be no good reason to challenge the convictions of these men, the bona fides of their support for the contribution in question or their belief that it was for the best interest of the company and its shareholders. * * *"

The directors who testified are men of national reputation, men of vast business experience and men whose motives are not in question; still the backbone of every corporation is the army of less prominent persons, who invested the funds that were essential to the growth and success of the company—the stockholders.

The bona fides of the directors cannot make legal the donation in question if the appellant had no power to make the same. As was observed by Lord Justice Bowery in Hutton v. West Cork Ry.[4] cited in the majority opinion:

"* * * The test there again is not whether it is bona fide, but whether, as well as being done bona fide, it is done within the ordinary scope of the company's business and whether it is reasonably incidental to the carrying on of the company's business for the company's benefit."

The main opinion suggests that the directors of appellant are "confident that

4. 23 Ch.D. 654 (1883).

their company presently and directly, or within the foreseeable future would receive a quid pro quo as the resultant of good will engendered by contributions." In my opinion it is impossible to declare that *good will* of any size or dimension or any good will whatsoever will result from the giving. In my opinion the real purpose, of these public spirited directors, is their desire to aid worthwhile causes that need their assistance. Why such studied effort to avoid permitting the stockholders to act and to avoid extensive litigation? Is there fear that the stockholders would withhold consent, or that they would place reasonable limitations on the donations?

The testimony of Mr. Harriman, chairman of the Board of the Union Pacific Railroad Company, would indicate that the directors had grave doubt that they had the power to make the contribution until the amendment of 1955, and likewise doubted that such donation would give a business benefit. Mr. Harriman stated:

" * * * For instance I am reliably informed some 100,000 corporations now participate in charitable giving and of these some 10,000 do so on an organized basis, but *we have restricted our giving in the past to organizations that may have direct business* benefit to our company.

\* \* \* \* \* \*

"We have also felt that the Federal Government and 36 states, including Utah, have encouraged corporations, the Federal Government by making their contributions tax deductible, and the States have passed legislation which declares a public policy in favor of corporate giving.

"We have also come to the conclusion there is a general public acceptance of the idea that corporations should act like public-spirited citizens, and cannot seek always to put the gift on a quid pro quo basis.

\* \* \* \* \* \*

"As the Court has been informed, we started this investigation in 1953, and have brought it on, so we have not been precipitate in our action or at all speedy. That is why we are so interested *when we learned that the Legislature of the* State of Utah had joined the other 35 states in passing the relieving action." (Emphasis added.)

Plaintiff's Exhibit 2 introduced in connection with the taking of the deposition of John S. Sinclair, a director of appellant is a consideration of company-sponsored foundations and states:

"Because of the fear that if under common law no direct return can be shown, a dissenting stockholder may successfully charge the directors with giving away money that does not belong to them, legal counsel prefers to have legislative support for making

contributions directly and through a company-sponsored foundation. In fact there are very few instances of company-sponsored foundations being set up in states that have not enacted so called permissive legislation expressly authorizing corporations to make gifts to welfare, scientific, and educational institutions.

\*     \*     \*     \*     \*     \*

"Judging by reports from corporate counsel *there is a far greater chance of justifying donations if enabling legislation has been passed* than when *full dependence must be placed upon interpretation of the common law."* (Emphasis added.)

The directors have proceeded on the assumption that the enabling legislation of 1955 gave full authority for their donation. But the majority opinion in holding, and I feel rightly, that the 1955 Act is ineffective to aid appellant since it can have no retrospective effect undercuts appellant's principal support.

With this crutch gone appellant has left only the crutch of common-law power which I am sure cannot afford the warrant needed.

We cannot obliterate the line of demarkation between desirable and lawful. The stockholders only can make lawful that which is desirable.

Nor is the argument persuasive that under the permissive legislation in 35 other states it is assumed that donations made in said states are legal. There is no disagreement among the members of this court that the amendment of 1955 gives no warrant for the donation.

I am of the opinion that the key to the proper determination of this case is found in the following statement from appellant's brief:

"That the *statutory power to donate* does not constitute a change in fundamentals, but represents a mere incidental change in appellant's charter may be demonstrated from the fact that it *could have been engrafted on the appellant's* charter by *shareholder amendment* rather than by *legislative amendment* and in such case unanimous consent of shareholders would not have been required." (Emphasis added.)

However, since the *statutory power* to donate is impotent to the accomplishment of the donation the appellant should pursue the alternative course and engraft on its charter the power to donate by shareholder amendment.

The trial court so viewed the matter, and I see no occasion for us to see it differently.

I am not yet ready to acknowledge that it is good public policy to permit exploitation by each monopolistic corporations, in permitting them to put their corporate hands into the pockets of their patrons, in order to take more than they need for a reasonable return on their investment by a rate structure established and permitted by a public agency. Such practices are dangerous, against public policy and constitute

a method of indirect taxation for such private charitable institutions.

Such a course may well lead to the granting of extensive congressional relief to .corporations similar to that recently granted by repeal of the 3% excise tax on railroad freight. It would seem that Congress was convinced (by some one) that the railroads needed assistance more than the government needed revenue.

The judgment should be affirmed.